UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 25 Cr. 241 (JPC)

EDSON BROWN,

Arraignment

Defendant.

------------------------------x

New York, N.Y.
June 5, 2025
12:10 p.m.

Before:

HON. JOHN PETER CRONAN,

District Judge

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
ANDREW JONES
Assistant United States Attorney

MARK DeMARCO
Attorney for Defendant

Also Present:

Lena Mersereau, Intern

(Case called)

MR. JONES: Good afternoon, Andrew Jones for the government. I'm joined by Lena Mersereau who is a law student working with us this summer.

THE COURT: Good afternoon Mr. Jones and Ms. Merserau.

MR. DeMARCO: Mark DeMarco for Edson Brown who joins me at counsel table.

THE COURT: Good morning, Mr. DeMarco and Mr. Brown.

THE DEFENDANT: Good afternoon.

THE COURT: We are here for Mr. Brown's arraignment and initial pretrial conference. I understand from the docket that Mr. Brown was arrested on a complaint in South Carolina on March 22nd and appears to have been presented in this district on March 22nd, or was it earlier than that?

MR. DeMARCO: Judge, I believe he was arrested in South Carolina in February.

THE COURT: In February. Okay. Got it.

And obviously Mr. Brown is currently detained, I assume it's on consent without with prejudice to future application or was there a bail argument?

MR. JONES: He had an argument when he came up here, your Honor. He was arrested on February I think the 22nd in South Carolina. He made an appearance in the District of South Carolina that following Monday. There might have been consent to bail there. It took a little over 30 days to get up here

and then there was a detention argument on first appearance on Monday.

THE COURT: Okay. And he was indicted on May 27th, is that right?

MR. JONES: I'm not looking at a calendar, but yes, your Honor.

THE COURT: So Mr. DeMarco, have you received a copy of the indictment, 25-CR-241?

MR. DeMARCO: Yes, your Honor.

THE COURT: Have you reviewed that indictment with Mr. Brown?

MR. DeMARCO: I have, and a copy has been provided to him at the MDC.

THE COURT: Mr. Brown, have you reviewed that indictment?

THE DEFENDANT: Yes, your Honor.

THE COURT: And have you discussed it with your attorney?

THE DEFENDANT: Yes, your Honor.

THE COURT: Mr. Brown, you are charged in the indictment on 18 counts. The first count is a firearms conspiracy from July 2023 through February 2025 in violation of 18 United States Code, Section 933(a)(3).

The second is firearms trafficking from July 2023 through February 2025 in violation of 18 U.S. Code

933(a)(1)(2).

The third is unlicensed dealing in firearms from July 2023 through February of 2025 in violation of 18 U.S. Code Section 922(a)(1)(A) and (2).

And then Counts 4 through 18 all charge unlicensed transportation of firearms, with that occurring on 15 occasions from July 30th 2023, through October 19th, 2024, in violation of 18 U.S. Code Sections 922(a)(3) and (2). And those Counts 4 through 18 involve conduct that occurred on July 30th, August 9th, September 3rd, September 23rd, October 11th, October 24th, October 31st, and December 16th, 2023, as well as conduct that occurred on February 9th, February 28th, April 21st, June 9th, August 5th, September 1st, and October 19th, 2024. Those 15 occasions, as alleged, make up Counts 4 through 18. The indictment also has forfeiture allegations that concern all 18 counts.

Mr. Brown, I just summarized the indictment for you. But do you wish for me to read it word for word, or do you waive its public reading?

THE DEFENDANT: No, sir.

THE COURT: So you waive its public reading?

THE DEFENDANT: Yes.

THE COURT: Mr. DeMarco, do you wish to enter a plea on behalf of your client?

MR. DeMARCO: Not guilty, your Honor.

THE COURT: I will enter a not-guilty plea for Counts 1 through 18 for Mr. Brown.

So let me go to Mr. Jones. I have reviewed the complaint and the indictment. I was hoping you could give me a summary of the alleged conduct and maybe, more importantly at this point, a summary of what materials the government has anticipated in producing in discovery, both in terms of categories of discovery and volume.

MR. JONES: Yes, your Honor.

To talk about the conduct first, it's laid out in the indictment. Well, in the indictment there's trafficking from both North Carolina and South Carolina charged. The complaint described the South Carolina conduct only, so I will describe it more fulsomely for the Court today.

Beginning by at least the summer of 2023, the defendant was working with others to purchase guns, ostensibly legally, beginning in North Carolina using what's called a "straw purchaser" to acquire guns and then bring them back up to New York. There were multiple trips made throughout the summer, fall, and winter in 2023 to North Carolina where he did this. A couple of those firearms have been recovered in New York City. At the time I believe there were two of them that came from North Carolina that were recovered. At the time they were recovered, the serial number had been defaced from the firearms, seemingly ground off with something. But through a

chemical process the NYPD lab was able to restore the serial number and identify those two guns as having come through the same straw purchaser connected to the defendant. The defendant is connected to those purchases by, among other things, his own cell phone location records that show him traveling from New York to North Carolina just prior to the purchases, returning just after. There are vehicle license-plate reader records that show the same vehicle traveling at about the same times, for example, across the GW Bridge. And the defendant has been cited by NYPD driving that car in the past. So that's the North Carolina conduct.

The South Carolina conduct is described in the complaint, but there, the defendant follows the same pattern. He travels to South Carolina. This is confirmed through, among other things, cell phone location records. And then works with a straw purchaser down there to purchase these various firearms, I think more than 60 coming from South Carolina. And then brings them back up to New York. When working in South Carolina, as described in the complaint, in addition to working with a straw purchaser directly, the defendant impersonated that straw purchaser. He took that person's ID and falsely portrayed himself as a South Carolina resident with no felony background when he is a New York resident with a felony background, unable to legally purchase guns. From there, he brought the guns back to New York. Again, multiple, I believe

five, were from the South Carolina batch had been recovered in the city. The same thing there, the serial numbers appeared to be ground off, but were able to be restored by the NYPD lab.

With that, your Honor, live cell phone location information was obtained for the defendant based off of his conduct in February of this year. We saw that he was going down from North Carolina to South Carolina again. He was observed in a gun shop with the straw purchaser he had been working with. They bought three guns. They got in the car together, and they were arrested at that time.

Following his arrest, the defendant's wallet was found in the back of a police car -- it seemed like maybe he was trying to kick it under the seat or something -- but a wallet with his debit card, his temporary New York ID, and identification belonging to two other people, one, the South Carolina resident who was the straw purchaser he was working with, and another ID from a North Carolina resident who was somebody other than the straw purchaser identified before.

With that, your Honor, I think the discovery here consists of some subpoena returns, various accounts for the defendant, such as ones at Apple, Cash App, Instagram, and the like had been subpoenaed. We have the returns for them. For his phone numbers, various subscriber and toll records for that from subpoenas. As far as search warrants, we've got to search warrants for his cell sites, for cell sites of coconspirators,

for his iCloud account, and for his phone following his arrest.

There are certain law enforcement records that inform a lot of this as well, principally ATF records the Form 4473 that's used to track the purchase of firearms, as well as various license-plate readers, videos and stills of him purchasing the guns in South Carolina, and records related to the recovery of the guns in New York kept principally by the NYPD.

None of that is huge. The iCloud and the phones are the biggest. I will tell Mr. DeMarco that a two-terabyte drive will certainly be fine. It's possible that one-terabyte will as well. The rest of the records are not particularly large. I expect it will take me about three weeks to kick the bulk of this out. I'm sure that I will have onesies and twosies to send after the initial production. But I think about three weeks will be the bulk of it. And I think that's generally where we are at.

THE COURT: Just thinking ahead to possible motions, any post-arrest statement?

MR. JONES: No. He was arrested in South Carolina. I think there is a small statement, I'm not sure. We will provide what we have. I'm not sure if Mr. DeMarco will really care to suppress it, but we will provide what we have.

THE COURT: In terms of the straw purchaser, is there a case against that person that you can speak to?

MR. JONES: Your Honor, at this point, only the defendant is charged. But the investigation is still going on.

THE COURT: Mr. DeMarco, in terms of that schedule, does that work with the defense?

MR. DeMARCO: I mean, sure. I mean, what can we do? If it's going to take him three weeks, it's going to take him three weeks. Obviously, we'd prefer discovery, sooner but I understand there is a process. I'll get the government a two-terabyte hard drive as soon as possible, and then I'll expect the discovery in three weeks.

THE COURT: Is there anything initially that can be produced that would be helpful for defense that's ready to go, Mr. Jones?

MR. JONES: Sure, a lot of this is -- the phone and the iCloud take the most time to produce. There's a lot of documents we can produce even without a hard drive by producing it online. There are some redactions that need to be made still, but yes.

MR. DeMARCO: Your Honor, maybe some of the ATF reports can be put on USAfx if that may speed up the process.

THE COURT: Is that possible?

MR. JONES: Yes, your Honor. We'll move more quickly on that.

THE COURT: Great. To the extent stuff can be produced earlier, on a rolling basis, that might help move the

case along. But otherwise, three weeks the government should produce the discovery and its possession that it is aware of. Of course, the government's obligation may be ongoing after that, but hopefully within three weeks, the defense should have the bulk of everything.

While we are on topic of the government's obligation, I'll put on the record, in late October 2020, the president signed the Due Process Protections Act. That statute has provisions that amend Rule 5 of the Federal Rules of Criminal Procedure. Rule 5(f) now requires me to remind the parties of the prosecutor's obligations under the Supreme Court decision in *Brady v. Maryland*. Pursuant to that statute and Rule 5(f), if I direct the prosecution to comply with its obligation *under Brady v. Maryland* and that case's progeny, to disclose to the defense all information, whether admissible or not, that is favorable to the defendant, material either to guilt or to punishment and known to the prosecution. Possible consequences for noncompliance may include dismissal of individual charges or the entire case and the exclusion of evidence in the case, as well as potentially professional discipline or court sanctions on the attorney or attorneys responsible.

As I typically do, after this proceeding, I will enter an order on the docket that more fully describes this obligation and possible consequences of failing to meet it. And I direct the prosecution to review and comply with that

order.

But for purposes of today, Mr. Jones, does the prosecution confirm it understands its obligation and will comply with it?

MR. JONES: Yes, I do, your Honor.

THE COURT: Thank you.

We're looking at the discovery to be produced in three weeks, Mr. DeMarco, when do you think would make sense for you to come back and ideally be in a position to advise whether you anticipate any motions?

MR. DeMARCO: Your Honor, it's not so much me, but Mr. Brown is concerned about coming to court on a regular basis, he's indicated that to me. Would the Court have us back in a month? I know it's only a week after the discovery deadline, but at least we'll able to report what progress has been made, if any, and then I can tell the Court how much time I need to review all of the discovery and decide what motions to make?

THE COURT: A month would bring us --

MR. DeMARCO: How about the week of July 14th, does that work for the Court?

THE COURT: That's fine too. Is there a particular day that would work for counsel that week?

MR. DeMARCO: July 14.

THE COURT: Does that work for the government?

MR. JONES: Your Honor, the 14th is fine.

THE COURT: Does 2:00 p.m. work?

MR. JONES: Yes, your Honor.

MR. DeMARCO: Yes, your Honor.

THE COURT: Great. We will come back on July 14th at 2:00 p.m. At that conference, we'll see where things stand in the case and where the defense is in reviewing the discovery, and see, Mr. DeMarco, if you are in position to advise on any motions then. We can set a motion schedule, otherwise, and we can set another conference in the near future to discuss that.

Do the parties have any views as to whether it makes sense to set a deadline for today for expert disclosures for the parties?

MR. JONES: I think without a trial set, I wouldn't ask for one.

MR. DeMARCO: I think it's a bit premature too, your Honor.

THE COURT: Say that again?

MR. DeMARCO: If Mr. Jones just said it's a bit premature, I agree with him.

THE COURT: Why don't we see where we are on July 14th, and I may set a schedule then. Of course, if a disposition is reached before then, reach out to Ms. Henrich, and we will schedule any appropriate proceeding.

Are there any other matters we should take up this

afternoon then?

MR. JONES: Your Honor, we ask to exclude time until July 14th, given the discussion here. That will enable us to produce the discovery both quickly and by the three-week date that we've talked about, give us some limited chance to review and hopefully enable Mr. DeMarco to come back here, in about a month, and be able to talk to the Court about motions and how much time is needed.

THE COURT: Mr. DeMarco?

MR. DeMARCO: No objection.

THE COURT: I will exclude time from today until July 14 2025, pursuant to Title 18, United States Code, Section 3161(h)(7)(A). I find that the ends of justice served by excluding such time outweigh the interests of the public and the defendant in a speedy trial. And that is for the reasons that Mr. Jones mentioned, to allow time for the government to compile and produce discovery in this case, to allow the defense to review that discovery, and, if appropriate, to consider any pretrial motions.

Is there nothing further, then, from the defense?

MR. DeMARCO: No. Thank you, your Honor.

THE COURT: Thank you all, and I will see the parties again on July 14th.

(Adjourned)